IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 3, 2018 at Jackson

## TARRANTS YVELT CHANDLER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-825      Mark J. Fishburn, Judge**

_____

### No. M2017-01539-CCA-R3-PC
_____

The Petitioner, Tarrants Yvelt Chandler, appeals from the Davidson County Criminal Court's denial of his petition for post-conviction relief. The Petitioner contends that he is entitled to post-conviction relief due to (1) numerous instances of ineffective assistance of his trial counsel; and (2) the State's failure to disclose "exculpatory evidence prior to trial." Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER., JJ., joined.

David M. Hopkins, Murfreesboro, Tennessee, for the appellant, Tarrants Yvelt Chandler.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Tammy Haggard Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

### I. Procedural History

The Petitioner was convicted of eight counts of rape by coercion and one count of criminal exposure to HIV. State v. Tarrants Chandler, No. M2013-00279-CCA-R3-CD, 2014 WL 3055972, at *1 (Tenn. Crim. App. July 7, 2014), perm. app. denied (Tenn. Nov. 20, 2014). The trial court imposed a total effective sentence of fifty years. Id. This court affirmed the Petitioner's convictions and sentences on direct appeal. Id. Our supreme court declined to review this court's opinion on November 20, 2014. Id.

On May 28, 2015, the Petitioner filed a timely pro se petition for post-conviction relief. An attorney was appointed to represent the Petitioner in this matter and an amended petition was filed. After an abortive evidentiary hearing, the post-conviction court granted the Petitioner's pro se motion "for appointment of substitute counsel." A new attorney was appointed to represent the Petitioner, and a second amended petition was filed on April 18, 2017.

The second amended petition alleged that trial counsel was ineffective (1) for failing to request a bill of particulars; (2) for failing to call certain witnesses at trial; (3) "by not obtaining cell phone records and . . . presenting them at trial"; (4) for failing to advise the Petitioner of the nature of the charges and potential penalties that he faced; (5) for failing "to adequately cross-examine" the victim; and (6) for "failing to request an accomplice charge" in the jury instructions.[1] The second amended petition also alleged that the State failed to disclose "exculpatory evidence prior to trial that the [] victim had made numerous changes in her statements to law enforcement."

The post-conviction court held a full evidentiary hearing on May 24, 2017, at which the Petitioner, the Petitioner's mother, Zula Robinson, and trial counsel testified. The post-conviction court took the matter under advisement at the conclusion of the evidentiary hearing. On July 31, 2017, the post-conviction court issued a written order denying post-conviction relief. This appeal followed.

## II. Trial Facts

The evidence at trial established that the Petitioner had a lengthy off and on relationship with the victim's mother, D.D.[2] Chandler, 2014 WL 3055972, at *1. In November 2008, the Petitioner moved into D.D.'s Gallatin Road apartment. Id. In 2009, D.D. noticed that the Petitioner "began to spend a great deal of time alone with the victim," D.D.'s oldest child. Id. at *2. The Petitioner moved out of the Gallatin Road apartment sometime in July 2009 after an incident when the Petitioner "grabbed D.D. by her neck and began choking her and threw her against a wall." Id.

D.D. stayed in contact with the Petitioner "after he moved out of the Gallatin Road apartment because he still wished to see her daughters." Chandler, 2014 WL 3055972, at *3. D.D. suspected that the Petitioner "still communicated with the victim via text message." Id. On one occasion, D.D. saw the Petitioner's car in a nearby alley and suspected that he was there to pick up the victim. Id. D.D. eventually allowed the Petitioner "to see her daughters near the end of September [2009] under the conditions

---

[1] This opinion will only address the factual and procedural background regarding the instances of ineffective assistance of counsel raised in the Petitioner's appellate brief.
[2] In order to protect the privacy of the victim, we will refer to the victim's mother by her initials.

that the visits occur in public places and only between the hours of 12:00 p.m. and 4:00 p.m. on Sundays." Id. Nonetheless, the Petitioner "was alone with the children during these visits." Id.

"In August 2009, D.D. and her children moved into a new residence on Sarver Avenue." Chandler, 2014 WL 3055972, at *3. The Petitioner and D.D. "rekindle[d] their relationship in October" 2009. Id. By November 2009, the Petitioner "was spending several nights a week at the Sarver Avenue house." Id. D.D. testified that she saw a text message on the victim's phone that she suspected the Petitioner had sent one night in December 2009 and that this caused her to question the Petitioner's relationship with the victim. Id. at *4. However, the Petitioner was arrested on an unrelated matter and went to jail on December 19, 2009. Id. The indictment alleged that all of the offenses against the victim occurred between May 1 and December 19, 2009.

D.D. "continued her attempts to reconcile with" the Petitioner while he was in jail. Chandler, 2014 WL 3055972, at *4. The Petitioner "moved back into the Sarver Avenue residence in February [2010] after he was released from jail." Id. However, the Petitioner moved out after "a disagreement" with D.D. over whether the victim would be allowed to visit the Petitioner's mother's house alone with the Petitioner. Id. D.D. testified that the Petitioner again turned violent, "destroying items in the house," pushing her "down the staircase," and striking "her head against the ground." Id. at *4-5. D.D. "took out an order of protection for herself and her children against" the Petitioner the day after this attack. Id. at *5.

"Several months" after this incident, D.D. "discovered that the victim was having sexual intercourse with her boyfriend." Chandler, 2014 WL 3055972, at *5. When D.D. confronted the victim about this, the victim "revealed to D.D. that she had a sexual relationship with" the Petitioner. Id. D.D. then contacted the police and began looking "for items in her house that indicated a sexual relationship between the victim and" the Petitioner. Id. "The victim showed D.D. thong underwear that the [Petitioner] had purchased for the victim and a bottle of douche that the [Petitioner] had given to the victim." Id. It was only after contacting the police that D.D. learned that the Petitioner was HIV positive. Id. "D.D. was tested for HIV, and the test was negative." Id.

The victim testified that she started using drugs with the Petitioner in December 2008. Chandler, 2014 WL 3055972, at *6. As she spent more time alone with the Petitioner, the victim "started to view the [Petitioner] as a boyfriend and believed that he wanted her to be his girlfriend." Id. The victim testified that the Petitioner told her "that once she turned eighteen years old they would live 'a perfect life together' and that she was going to be the mother of his little boy and stepmother to his daughter." Id. The victim further testified that she began having sex with the Petitioner when she was fourteen years old. Id.

-3-

The victim gave differing timeframes for when her first sexual encounter with the Petitioner occurred. Chandler, 2014 WL 3055972, at *6. In various pretrial statements, the victim stated that it occurred in May, June, or July 2009. Id. However, at trial, the victim testified that it occurred in January 2009, outside the timeframe listed in the indictment. Id. The victim testified about two incidents that occurred at the Gallatin Road apartment. Id. at *7. The first occurred in the kitchen when the Petitioner "had her stand on the kitchen table" and then "performed oral sex on her for about fifteen minutes." Id. The second occurred on "a pallet on the floor" when the Petitioner "performed oral sex on her and inserted his fingers into both her vagina and her rectum." Id.

The victim testified that the Petitioner continued to see her after he moved out of the Gallatin Road apartment. Chandler, 2014 WL 3055972, at *7-8. The victim recalled "an incident where she went with the [Petitioner] to his mother's house," and the Petitioner "performed oral sex on her" and "had sexual intercourse with her." Id. at *7. The victim also testified that there was an incident when the Petitioner "performed oral sex on her in the den" of the Sarver Avenue house. Id. at *8. The victim further testified that the Petitioner "performed oral sex on her in her bedroom at the Sarver Avenue house" on December 19, 2009. Id. at *9. This was the only incident that the victim provided a date for. Id. at *7-9.

The victim testified that the Petitioner "referred to her vagina as 'Chicken'" and "used the term 'Becky' to describe oral sex." Chandler, 2014 WL 3055972, at *9. The victim wrote the Petitioner letters while he was in jail and received letters from the Petitioner. Id. In one letter, the Petitioner "asked the victim if she missed 'Becky,' and he wrote that he missed 'chicken like a mutha [sic] um um I can't wait.'" Id. (alteration in original). In another letter, the Petitioner wrote that "'I wana [sic] eat some chicken bad ass hell u know dats my s--t [sic]'" and referred to the victim as "FSM." Id. (alterations in original). The victim explained that "FSM" "stood for 'Future Son's Mother.'" Id.

In addition to the conflicting statements about when the victim and the Petitioner began having sex, there were numerous other inconsistencies between the victim's initial statement to the police, her forensic interview, her statement to a detective, and her trial testimony. Chandler, 2014 WL 3055972, at *7-10. The victim "initially stated in her forensic interview that the [Petitioner] did not place anything in her rectum," but testified at trial about an incident when the Petitioner inserted his fingers into her rectum. Id. at *7. The victim also initially stated that the Petitioner had threatened her not to tell anyone about their relationship, but testified "that she remembered two weeks prior to trial that the [Petitioner] did not threaten her." Id. at *10. Additionally, the victim told the police that the Petitioner "had placed his hand over her mouth to prevent her from

-4-

screaming for her mother, but admitted that this statement was inaccurate" because the Petitioner instead "covered her mouth when she 'was making sex noises.'" Id.

The victim testified that she told her mother about "the nature of her relationship with" the Petitioner after she was caught having sex with her boyfriend. Chandler, 2014 WL 3055972, at *10. The victim claimed that she did not tell her mother "to get out of trouble for having sex with her boyfriend but because she finally felt safe enough after the order of protection to believe that the [Petitioner] could not come back and harm her family." Id.

Erin O'Connor, "a friend of the family," testified that "in the fall of 2009" the victim received a phone call from the Petitioner and that she then saw the victim and the Petitioner sitting in the Petitioner's car. Chandler, 2014 WL 3055972, at *11. Ms. O'Connor approached the car because "it seemed odd that [the victim] was [] sitting in [a] car with a stranger," but she dropped the matter after "the victim assured her that everything was fine and that she was with her 'step-dad.'" Id.

Detective Jill Weaver testified that "the victim initially indicated that she was forced and threatened into a sexual relationship with the [Petitioner] but later indicated that the [Petitioner] did not use force or threats." Chandler, 2014 WL 3055972, at *11. Detective Weaver admitted that she "did not note this change in her reports." Id. Detective Weaver also took a statement from the Petitioner in which the Petitioner "posited that there would be numerous witnesses to contradict the victim's version of events" without providing their names and "offered numerous theories as to why these allegations were made against him." Id. at *12. The Petitioner also provided different meanings for "the terms 'Becky,' 'chicken,' and 'FSM.'" Id. at *13. Detective Weaver testified that she "was not able to see any of the text messages or cell phone records of conversations between the victim and the [Petitioner]" because the victim "no longer had the texts stored on her phone" and the victim's cell phone provider did not have "a backlog or backup database." Id.

### III. Post-Conviction Hearing

The Petitioner testified that trial counsel was appointed to represent him a few months before his trial was scheduled to begin. The Petitioner claimed that trial counsel visited him three or four times before trial. The Petitioner further claimed that trial counsel did not discuss the charges with him, but did review the discovery materials with him "[t]o a certain extent."

The Petitioner testified that he never discussed a bill of particulars with trial counsel. The Petitioner believed that trial counsel should have requested a bill of particulars to "narrow[] down the timeline" in order to establish an alibi defense.

However, the Petitioner admitted that the victim's testimony was vague as to the dates of the offenses.

The Petitioner testified that trial counsel should have presented an expert witness on HIV transmission during his trial. The Petitioner wanted an expert to testify as to "the percentage and the probabilities" of contracting HIV from sexual contact with someone who was HIV positive. The Petitioner believed that this would have impeached the victim's testimony because she testified that they had sex "hundreds of times" and she did not contract HIV. The Petitioner testified that he never discussed obtaining such an expert with trial counsel.

The Petitioner testified that he wanted trial counsel to call his mother, Ms. Robinson, as a witness to show that he was living with her and not at the Gallatin Road apartment in July and August 2009. The Petitioner also wanted trial counsel to call his former girlfriend, Andrea Elathorp, to show that he was living with her from August to November 2009. Additionally, the Petitioner wanted trial counsel to call the victim's boyfriend, Russell Duke, and the woman who administered her forensic interview, Dawn Harper, at trial to impeach the victim's testimony.

The Petitioner testified that trial counsel should have obtained his cell phone records and the cell tower data for both his phone and the victim's. The Petitioner believed that the records would have shown that he did not send "sexual text messages" to the victim and "never talked" with the victim. The Petitioner also believed that the cell tower data for his phone and the victim's phone would have shown that he "was not in the area . . . [or] even in [the same] town" when the offenses occurred. The Petitioner testified that he never talked with trial counsel about the cell phone records.

The Petitioner testified that he initially received a plea offer from the State of fifteen years to be served at eighty-five percent and that he "[o]f course" rejected the offer because he was "innocent." The Petitioner recalled that the morning of his trial the State offered him six years to be served at thirty-five percent. The Petitioner rejected that offer as well. The Petitioner claimed that trial counsel never discussed the possible penalties he faced. According to the Petitioner, trial counsel told him that these were "serious charges, but he never said that [the Petitioner] would get life if [they] went to trial." The Petitioner claimed that trial counsel never discussed the "pros or cons of that plea bargain." The Petitioner admitted that he "had several prior convictions," but stated that he had never been charged with a sex offense before. The Petitioner testified that he would have taken either of the plea offers if he had known that he could get a total effective sentence of fifty years. However, the Petitioner also testified that he was aware of the State's proof and that it was his choice to go to trial.

-6-

The Petitioner testified that he believed trial counsel did not properly cross-examine the victim because he did not ask her if she had contracted HIV. The Petitioner also believed that trial counsel should have cross-examined the victim "more" about her not reporting these allegations until after she was caught having sex with her boyfriend and about her initial claims that the Petitioner threatened her. The Petitioner also believed that trial counsel should have requested an accomplice jury instruction because the victim testified that their sexual contact was "consensual."

The Petitioner believed that the State had withheld changes to the victim's statements. However, the Petitioner admitted that trial counsel cross-examined the victim on the inconsistencies between her statements and her testimony. The Petitioner also admitted that trial counsel cross-examined Detective Weaver about the changes and the fact that she did not include the changes in her report.

The Petitioner's mother, Ms. Robinson, testified that the Petitioner would "always stay with [her]" when "he would break up with [D.D.]." Ms. Robinson recalled that the Petitioner moved out of D.D.'s apartment and into her house sometime during the summer of 2009, but she could not recall the exact date. Ms. Robinson claimed that afterwards, the Petitioner "got his own place" and did not move back in with D.D. Ms. Robinson admitted that she did not know if the Petitioner had any contact with the victim after he moved out of D.D.'s apartment.

Trial counsel testified that he was not the Petitioner's first attorney. Trial counsel was appointed to this case a few months before trial. Trial counsel recalled that the Petitioner's attitude was that they were going to trial "no matter what" and that the Petitioner "was absolutely adamant that he was . . . innocent." Trial counsel could not specifically recall reviewing the discovery materials with the Petitioner, but believed that he had because that was his general practice. Trial counsel also could not specifically remember going over trial strategy with the Petitioner in their pretrial meetings, but he was "sure" that they had.

Trial counsel recalled that he may have discussed a bill of particulars with the Petitioner. Trial counsel testified that it may have been the better practice to request a bill of particulars, but he felt prepared to go to trial based on his review of the discovery materials. Additionally, trial counsel recalled that the victim's trial testimony was vague about the dates and times of the offenses, so he was not sure if a bill of particulars would have clarified much.

Trial counsel testified that he did not believe an expert witness on HIV transmission would have been as effective as the Petitioner believed. Trial counsel recalled that D.D. and the Petitioner had a long sexual relationship, and it was established at trial that D.D. had not contracted HIV.

Trial counsel testified that he made a strategic decision not to call Ms. Robinson. Trial counsel explained that he talked to Ms. Robinson prior to trial and that he considered calling her as a witness, but not to establish the Petitioner's whereabouts during the summer of 2009. Instead, he considered calling Ms. Robinson because Ms. Robinson had recorded a phone conversation between herself and the victim where she tried to get the victim to admit that she made up the allegations. However, the victim stated that the Petitioner "never should have done what he [did]," and trial counsel did not want to risk the recording being introduced at trial. In the end, trial counsel did not believe that Ms. Robinson's testimony would have "added much to the trial." Trial counsel explained again that the victim's testimony was vague about the dates and times of the offenses and that there was evidence that the Petitioner would visit and stay at D.D.'s apartment even after he moved out.

Trial counsel testified that he talked to Ms. Elathorp prior to trial, but he felt that she would be "a slightly volatile witness." Trial counsel explained that Ms. Elathorp made "a scene" during trial and was removed from the courtroom. Trial counsel further explained that he worried that calling Ms. Elathorp could expose the Petitioner to other unflattering impeachment evidence. Additionally, trial counsel noted that both D.D. and the victim testified about the Petitioner's moving out of their apartment and moving in with Ms. Robinson and then Ms. Elathorp. Trial counsel also believed that the Petitioner had stated in his interview with Detective Weaver that he would visit the victim on Sundays; therefore, trial counsel did not believe that Ms. Robinson and Ms. Elathorp would have benefitted the defense.

Trial counsel testified that he considered calling Mr. Duke, but he did not feel that he needed to because the victim admitted to everything he would have testified to. Trial counsel was not asked about his decision not to call Ms. Harper.

Trial counsel did not recall having any conversations with the Petitioner about his cell phone records or cell tower data. Trial counsel doubted that the cell phone records the Petitioner wanted him to acquire would have even been available by the time he was appointed to this case. Trial counsel further believed that the cell tower data would not have been of much benefit given that the victim's testimony was vague as to the dates and times of the offenses and the Petitioner's own statement that he continued to visit the victim even after he had moved out.

Trial counsel was sure that he discussed the charges with the Petitioner, but he could not specifically recall if they discussed the range of punishment. Trial counsel testified that it was his usual practice to discuss the range of punishment with his clients. Trial counsel recalled the Petitioner's getting an offer of either six or ten years to be served at thirty-five percent on the morning of trial. Trial counsel thought that this was an "extraordinary" offer and he "pushed" the Petitioner to accept it. The fact that he so

-8-

aggressively urged the Petitioner to accept the offer caused trial counsel to believe that he had discussed the range of punishment with the Petitioner in order to highlight how good the offer was. However, the Petitioner rejected the offer because it required him to admit to having sexual contact with the victim. Trial counsel testified that the Petitioner did not even want to talk about accepting an offer if it required him to admit to having sexual contact with the victim. Trial counsel had "no doubt" that the Petitioner would have rejected the plea offer knowing that he would get a fifty-year sentence if he lost at trial.

Trial counsel recalled that he cross-examined the victim for three or four hours. Trial counsel further recalled that he had fifteen pages of "statement charts" where he had "mapped out all of [the victim's] prior statements by . . . topic" and that he used this during his cross-examination. Trial counsel testified that he cross-examined the victim about the inconsistencies between her statements and her trial testimony. Trial counsel believed that it "was one of the more involved cross-examinations that [he had] done" and that the victim "was extremely inconsistent." Trial counsel also recalled that the victim's medical records had been introduced at trial and showed that she did not have any sexually transmitted diseases. According to trial counsel, he used that to argue to the jury that it was unlikely that the victim and the Petitioner had sexual contact because the victim was not HIV positive.

Trial counsel admitted that he did not request an accomplice jury instruction. Trial counsel testified that he thought the trial court would have been skeptical of such a request.

Trial counsel testified that he had no reason to believe that the State withheld any evidence. Trial counsel explained that he had seen all of the victim's statements and "knew that she had changed her story" "[m]any times." Trial counsel testified that he prepared his cross-examination based on those inconsistencies. Trial counsel further testified that he felt prepared to go to trial and that he had presented the defense the Petitioner had wanted.

## IV. Post-Conviction Court's Order

The post-conviction court concluded that trial counsel was not ineffective for failing to request a bill of particulars. The post-conviction court noted that the victim's testimony "was fragmented, changed many times, and was non-specific in most instances as to date and time." As such, the post-conviction court concluded that "there was little additional information that would likely have been gleaned from a bill of particulars."

The post-conviction court concluded that the Petitioner failed to establish that he was prejudiced by trial counsel's failure to call an expert on HIV transmission, Ms. Elathorp, and Mr. Duke at trial because the Petitioner failed to present these witnesses at

the post-conviction hearing. With respect to Ms. Robinson, the post-conviction court noted that Ms. Robinson's testimony was "uncertain" as to "where the [P]etitioner lived at the time." The post-conviction court concluded that trial counsel made a strategic decision not to call Ms. Robinson at trial. The post-conviction court did not make any findings with respect to Ms. Harper.

The post-conviction court concluded that trial counsel was not ineffective for failing to obtain the Petitioner's cell phone records and cell tower data. The post-conviction court noted that the Petitioner failed to show that these records existed at the time trial counsel was appointed to the case. The post-conviction court also noted that the "lewd or sexually oriented texts" were of "little significance" to the State's case. The post-conviction court further noted that the cell tower data would "not account for the time in the indictment from May 1 until [the Petitioner] moved out" of the Gallatin Road apartment and that "the vagueness of the victim's dates and times for when the incidents occurred would make it unlikely that phone records could establish an alibi."

The post-conviction court did not find the Petitioner's testimony that trial counsel failed to make him "fully aware of the possible punishment of being convicted" to be credible. Moreover, the post-conviction court concluded that the Petitioner made "his own decision" to go to trial and that he "would not accept any offer regardless of the consequences if it required him to acknowledge sexual contact [with the victim] and the State's offer always required that."

With respect to the accomplice jury instruction, the post-conviction court noted that "consent by a minor is no longer a defense to rape as a matter of law."

The post-conviction court concluded that trial counsel was not ineffective in his cross-examination of the victim. The post-conviction court noted that trial counsel "conducted a lengthy cross-examination of the victim and fairly raised numerous inconsistencies in her versions of the events and which was guided by the fifteen page statements sheet he prepared."

The post-conviction court also rejected the Petitioner's claim that the State had withheld exculpatory evidence "by not properly documenting changes in the victim's statement." The post-conviction court concluded that the fact that trial counsel "was aware of the victim's changing stories and . . . extensively crossed her on her inconsistences" indicated "that the information was not suppressed." The post-conviction court also concluded that the Petitioner had failed "to point to any inconsistent statements that were made by the victim that [were] not made available to him before trial."

-10-

# ANALYSIS

## I. Ineffective Assistance of Trial Counsel

The Petitioner contends that he is entitled to post-conviction relief due to numerous instances of ineffective assistance of trial counsel. The Petitioner argues that trial counsel was ineffective for not requesting a bill of particulars because it would have allowed him to present "an alibi defense." Next, the Petitioner argues that trial counsel was ineffective "by not presenting a number of witnesses," specifically an expert on HIV transmission, Ms. Robinson, Ms. Elathorp, Mr. Duke, and Ms. Harper. The Petitioner also argues that trial counsel was ineffective for "failing to obtain and present cell phone records" because those records "would have shown that [the Petitioner] was not in the same location as the [] victim, nor was he sending her inappropriate or sexual text messages." The Petitioner further argues that trial counsel failed to advise him "of the nature of his charges and the potential penalties he was facing if convicted" and that this caused him to reject a favorable plea offer from the State. Next, the Petitioner argues that trial counsel failed to properly cross-examine the victim by failing to "elicit testimony from her that she only made the allegations . . . after she was caught having sex with her boyfriend." The Petitioner also argues that trial counsel was ineffective for failing to request an accomplice jury instruction because the victim was an accomplice under "the law at the time" of the Petitioner's trial due to the victim's testimony that the sexual contact was "consensual." Finally, the Petitioner argues that post-conviction relief is warranted due to the cumulative effective of trial counsel's errors. The State responds that the post-conviction court did not err in denying the petition on these grounds.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made

-11-

under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The evidence at the post-conviction hearing failed to establish that the Petitioner was prejudiced by trial counsel's failure to request a bill of particulars. A bill of particulars is designed to provide a "defendant with information about the details of the charge against him if this is necessary to the preparation of his defense," to "avoid prejudicial surprise at trial," and "to preserve a plea against double jeopardy." State v. Sherman, 266 S.W.3d 395, 408-09 (Tenn. 2008) (internal citations and quotation marks omitted). "A bill of particulars is not a discovery device and is limited to information a defendant needs to prepare a defense to the charges." Id. at 409. As the post-conviction court noted, the victim's testimony at trial was vague as to the dates and times of the offenses. The only incident tied to a specific date was the incident when the Petitioner performed oral sex on the victim before he was arrested on December 19, 2009. Furthermore, trial counsel testified that he felt prepared to go to trial based on his review of the discovery materials. We agree with the post-conviction court's conclusion that "there was little additional information that would likely have been gleaned from a bill of particulars."

With respect to the Petitioner's claim that trial counsel failed to call "a number of witnesses" at trial, we note that the Petitioner failed to call an expert on HIV transmission, Ms. Elathorp, Mr. Duke, or Ms. Harper at the evidentiary hearing. This court has long held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Generally, "this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the

-12-

stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id. We cannot speculate as to what a witness may have said if presented or how the witness may have responded to a rigorous cross-examination. Id. As such, the Petitioner has failed to prove he was prejudiced by failing to call these witnesses.

Regarding Ms. Robinson, we agree with the post-conviction court's conclusion that trial counsel made a strategic decision not to call her at trial. The post-conviction court noted that Ms. Robinson's testimony at the evidentiary hearing was "uncertain" as to when the Petitioner moved in with her in the summer of 2009. Additionally, Ms. Robinson was unaware if the Petitioner had any contact with the victim after he moved out of D.D.'s apartment. Furthermore, trial counsel testified that he worried calling Ms. Robinson might have led to the admission of an incriminating recording of a phone conversation between Ms. Robinson and the victim. Accordingly, we conclude that trial counsel was not ineffective for failing to call Ms. Robinson at trial.

The Petitioner failed to establish that he was prejudiced by trial counsel's failure to obtain his cell phone records and cell tower data for both his and the victim's cell phones. With respect to the cell phone records, the Petitioner failed to show at the evidentiary hearing that these records still existed at the time trial counsel was appointed to his case. Detective Weaver testified at trial that there were no text messages on the victim's cell phone and that the victim's cell phone provider did not keep that data. Nor did the Petitioner present his cell phone records at the evidentiary hearing. With respect to the cell phone tower data, we agree with the post-conviction court that this data would "not account for the time in the indictment from May 1 until [the Petitioner] moved out" of the Gallatin Road apartment or the time when the Petitioner moved back in with D.D. at the Sarver Avenue residence in November until his arrest on December 19, 2009. The victim only testified that one of the offenses occurred during the time when the Petitioner was not living with her family. Furthermore, both D.D. and Ms. O'Connor testified about the Petitioner's having contact with the victim during this timeframe. As such, we agree with the post-conviction court that it was "unlikely that phone records could establish an alibi."

The Petitioner also failed to establish that trial counsel did not advise him of the nature of the charges and the potential penalties that he faced. Trial counsel testified that he discussed the charges with the Petitioner. Trial counsel did not specifically remember discussing the range of punishment with the Petitioner. However, trial counsel testified that it was his usual practice to discuss the range of punishment with his clients. Trial counsel also aggressively "pushed" the Petitioner to accept the State's offer the day of trial. Trial counsel believed that he would have discussed the range of punishment in these discussions to highlight how good the State's final offer was. Moreover, the Petitioner testified that it was his decision to reject the plea offer and go to trial. Trial

-13-

counsel testified that the Petitioner "was absolutely adamant that he was . . . innocent" and would not accept any offer that required him to admit to sexual contact with the victim. As such, we conclude that this issue is without merit.

The Petitioner failed to establish that trial counsel was ineffective in his cross-examination of the victim. Trial counsel cross-examined the victim for three or four hours utilizing fifteen pages of "statement charts" where he had "mapped out all of [the victim's] prior statements by . . . topic." Trial counsel believed that it "was one of the more involved cross-examinations that [he had] done" and that he was able to show the jury that the victim "was extremely inconsistent." Specifically, the victim was cross-examined about her initial claims that the Petitioner had threatened her. D.D. and the victim both testified about the circumstances of the victim's reporting the allegations after she was caught having sex with her boyfriend. Additionally, trial counsel testified that the victim's medical records were introduced at trial and that he argued to the jury that it was unlikely that the victim and the Petitioner had sexual contact because the victim was not HIV positive. Accordingly, we conclude that this issue is also without merit.

The Petitioner argues that trial counsel was ineffective for not requesting an accomplice jury instruction because the victim testified that the sexual contact with the Petitioner was "consensual." The Petitioner argues that such an instruction was available under "the law at the time." However, "it has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses such as simple rape." State v. Collier, 411 S.W.3d 886, 899 (Tenn. 2013). The Petitioner was charged and convicted of rape by coercion rather than statutory rape; therefore, even at the time of the Petitioner's trial, the victim would not have been classified as an accomplice. See Collier, 411 S.W.3d at 886 (overruling prior case law classifying victims of statutory rape as accomplices and requiring corroborative evidence). As such, trial counsel was not ineffective for failing to make a baseless request for an accomplice jury instruction.

Finally, the Petitioner contends that post-conviction relief is warranted due to the cumulative effect of trial counsel's errors. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). In the post-conviction context, "a petitioner cannot successfully claim he was prejudiced by [trial] counsel's cumulative error when the petitioner failed to show [trial] counsel's performance was deficient." James Allen Gooch v. State, No. M2014-00454-CCA-R3-PC, 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015). The Petitioner has failed

-14-

to prove that trial counsel was deficient or that he was prejudiced for any of the issues raised in his brief. As such, we conclude that the cumulative error doctrine does not apply to this case.

## II. "Withheld" Evidence

The Petitioner contends that the State failed to disclose "exculpatory evidence prior to trial" and that this entitles him to post-conviction relief. The Petitioner argues that the victim "originally stated to [the] police that [the Petitioner] had used force and made threats towards her, but changed her story before trial." The Petitioner further argues that the police were aware of these changes, "but had never documented them, and therefore had not turned those over to [the Petitioner]." The Petitioner alleges that he "could have prepared a better defense" had this been disclosed before trial. The State responds that this information was not suppressed and that trial counsel used this information to cross-examine the victim at trial.

In order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). This also includes evidence which could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). However, the State is not required to disclose "information that the accused already possesses or is able to obtain, or information which is not possessed by or under the control of the prosecution or another governmental agency." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (internal citations omitted).

Here, the Petitioner failed to establish that the State withheld any evidence. Trial counsel testified that he had no reason to believe that the State withheld any evidence. Trial counsel explained that he had seen all of the victim's statements and "knew that she had changed her story" "[m]any times." Trial counsel prepared fifteen pages of "statement charts" that he used during his cross-examination of the victim. The jury heard the numerous inconsistencies in the victim's statements and trial testimony, including her original allegation that the Petitioner had threatened her and had "placed his hand over her mouth" as well as the victim's recanting of those allegations at trial. Detective Weaver was also questioned about the fact that "the victim initially indicated that she was forced and threatened into a sexual relationship with the [Petitioner] but later indicated that the [Petitioner] did not use force or threats" and that she "did not note his change in her reports." All of the "exculpatory evidence" the Petitioner alleges that the State failed to disclose prior to trial was introduce at trial. As such, we conclude that this issue is without merit and affirm the post-conviction court's denial of the petition.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE